IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELISSA CRANE | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 22-4650 |
| | : | |
| ALEJANDRO MAYORKAS | : | |

# MEMORANDUM

**MURPHY, J.** April 12, 2024

In our chambers, my clerks and I have seen a lot of interesting things behind the lawyers on the computer screen. Car interiors, courthouse hallways, messy bedrooms, palm trees, oceans, Legos, intriguing books, cats and dogs, a garage once, and all sorts of artwork — even a self-portrait of an artist painting his wife, who turned out to be ancestors of the lawyer.[1] You might even find a couple revealing items behind me on those calls. Usually, it's a harmless way to make a connection in this disconnected world. But there is plenty of art that ought not to be looming over work meetings. This case started because an employee of FEMA was bothered by a painting of a partially unclothed African woman that she saw in her supervisor's videoconference background. And things escalated from there into hostile workplace and retaliation allegations.

The case cannot survive summary judgment. We needn't be art critics. Pivotally, Ms. Crane did not timely exhaust her claims with the Equal Opportunity Employment Commission. The EEOC requires federal employees to contact the agency within 45 days of actions taken against them that are prohibited by Title VII. Of what remains of her case, Ms. Crane failed to adduce any evidence suggesting that the reasons for the supposedly adverse actions are

---

[1] Charles Wilson Peale's "Self-Portrait with Angelica and Portrait of Rachel" — worth a look.

pretextual.  Therefore, we grant summary judgment in favor of the government.

I.      **Background**[2]

The Federal Emergency Management Agency (FEMA) hired Melissa Crane on May 4, 2017.  DI 37-2 ¶ 3.  Ms. Crane worked as a FEMA reservist.  *Id.*  FEMA deploys reservists on an on-call basis to help with disaster relief.  *Id.* ¶ 2; *see id.* ¶ 1.  Reservists "hold time-limited intermittent appointments."  *Id.* ¶ 2.

FEMA deployed Ms. Crane in September 2020 to assist with recovery efforts from a tropical storm in Louisiana.  *Id.* ¶ 5.  At the time, Ms. Crane worked remotely because of the COVID-19 pandemic.  *Id.* ¶ 6.  She had several supervisors on the Louisiana recovery project, including Antonio Rowland.  *See id.* ¶¶ 7-13.

Like Ms. Crane, Mr. Rowland worked remotely.  *Id.* ¶ 15.  Ms. Crane and Mr. Rowland attended "daily team meetings involving approximately 30 employees."  *Id.* ¶ 21.  The team meetings were held virtually.  *See id.* ¶ 18.

During virtual meetings, Ms. Crane noticed a painting visible on the wall behind Mr. Rowland.  *See id.* ¶¶ 18, 21-22.  She interpreted it "as an oil painting depicting an African woman carrying a basket over her head."  *Id.* ¶ 22.  "[T]he woman's abdomen and a portion of her lower breasts are visible."  *Id.* ¶ 19.  The painting is pictured below:

---

[2] The facts in our background section come from (i) the undisputed material facts submitted by the government, *see* DI 23, and (ii) to the extent a genuine dispute of material fact exists, Ms. Crane's version of the fact, *see* DI 37-2.  Ms. Crane submitted a few extra facts that the government responded to.  *See id.* ¶¶ 126-28.  We accept her version as true.



DI 28-1 Ex. I.  The screenshot below shows how Mr. Rowland's[3] painting appeared to Ms. Crane:



---

[3] Mr. Rowland and his wife collect art like the painting in question and "have various pieces of African art throughout their house."  DI 37-2 ¶ 17.  Mr. Rowland "is African American and his wife is Nigerian."  *Id.* ¶ 16.

3

*E.g.*, *id.* Ex. J (painting boxed in yellow); *see* DI 37-2 ¶ 20.

Ms. Crane objected to Mr. Rowland having the painting visible. *See* DI 37-2 ¶ 28. On October 16, 2020, she told Erin Densford — one of her supervisors — that, "from [her] perspective," the painting was "distracting, insensitive, and not appropriate for a professional environment." *Id.*; *see id.* ¶ 26. Ms. Crane's email did not say that she was being harassed or discriminated against because of her sex. *Id.* ¶ 31. Ms. Densford responded that she would "mull over the best approach" to resolve the issue. *Id.* ¶ 33.[4]

A few weeks later, Ms. Crane contacted another FEMA supervisor — Tonia Pence — about Mr. Rowland's painting. *See id.* ¶ 38. Ms. Crane said that Ms. Densford had "not responded with proposed solutions" to her concerns about the painting. DI 28-1 Ex. L. Ms. Crane explained that she may not be "seeing the whole image or misinterpreting the context of th[e] artwork," but she still found the painting inappropriate. *Id.* Ms. Pence agreed with Ms. Crane — saying that she "appreciate[d] someone other than" herself noticing the painting. *Id.*; *see also* DI 37-3 Ex. VV at 22 (ECF) (Ms. Pence testifying that she did not understand Ms. Crane's complaint to be about sexual harassment, but the painting "was not what you would want in your professional office setting, especially captured on a camera").

The same day, Mr. Rowland informed two FEMA employees, including Ms. Densford, that he removed and replaced the painting. *See* DI 28-1 Ex. N. Mr. Rowland said he "really was not conscious of the" painting, and "it [was] not [his] intention for any of the art pieces in [his]

---

[4] Ms. Crane did not complain directly to Mr. Rowland out of fear of retaliation. *See id.* ¶ 27. She did not mention sexual harassment or discrimination in her complaint to Ms. Densford. *Id.* ¶ 31.

home to be viewed as offensive to anyone." *Id.* Ms. Crane later learned that Mr. Rowland removed the painting. *See id.* Ex. L. Mr. Rowland "never made any sexual advances on or sexually explicit comments to [Ms.] Crane," nor did he ever "physically threaten[] her." DI 37-2 ¶ 37.

Shortly after her initial complaint about the painting, Ms. Crane contacted Ms. Densford about a different FEMA work opportunity located in Hawaii. *See id.* ¶ 44; DI 28-1 Ex. Q. The Hawaii position would have different work, but Ms. Crane would keep the same "compensation, grade level, [and] job title." DI 37-2 ¶ 46. Unlike her position on the Louisiana project, she would not be a team leader on the Hawaii project. *See id.* ¶ 47.

Ms. Densford told Ms. Crane that she could not release her from the Louisiana project. DI 28-1 Ex. Q; *see* DI 37-2 ¶ 51.[5] Ms. Densford said the Louisiana project was the "most complicated recovery" FEMA had at the time, and she could not "take away someone so skilled." DI 28-1 Ex. Q; *see* DI 37-2 ¶¶ 52-53. The Louisiana project needed Ms. Crane because she "was one of only seven" qualified individuals. DI 37-2 ¶ 52.

A few months later, in January 2021, FEMA promoted Mr. Rowland — whose painting Ms. Crane had complained about. *See id.* ¶ 54. The promotion upset Ms. Crane. *Id.* ¶ 55. Frustrated, Ms. Crane emailed three FEMA employees about "recent work environment violations" by Mr. Rowland. *See* DI 29-1 Ex. S. Ms. Crane said that promoting Mr. Rowland

---

[5] FEMA uses a deployment tracking system (DTS) to "redeploy" its reservists. DI 37-2 ¶ 48. DTS "ensure[s] an equal opportunity for all employees to work on deployments." *Id.* ¶ 49. Ms. Crane did not recall whether she ever submitted her reassignment request through DTS. *Id.* ¶ 50.

sent the wrong message about FEMA's workplace culture after (1) Mr. Rowland had "displayed adult, sexually explicit content" during meetings, and (2) FEMA mishandled her complaint about the painting. *Id.* Ms. Crane's complaint was referred to FEMA's Office of Professional Responsibility. DI 37-2 ¶ 58.

In March 2021, Ms. Crane requested "retroactive credit" for a FEMA training course that she attended six years prior. *See id.* ¶¶ 59-60. Ms. Crane said that she did not receive credit for the training course because she "was only an 'observer' due to [her] grade level." DI 29-1 Ex. U. Handling her request, Diane Walbrecker — a FEMA training course manager — said Ms. Crane could not get retroactive credit because her name did not appear on the course roster. *See id.* Ex. V; DI 37-2 ¶ 63. Ms. Densford delivered Ms. Walbrecker's message to Ms. Crane and told Ms. Crane that she had not taken the prerequisite course necessary to get credit. *See* DI 29-1 Ex. W.

On July 20, 2021, Ms. Crane received a letter of reprimand for "inappropriate conduct." DI 37-2 ¶ 79. The letter from Marc Wilson — FEMA reservist program manager — cited two instances of misconduct by Ms. Crane that did not reflect a "commitment" to "the FEMA Reservist Program Conditions of Employment." DI 29-2 Ex. BB. Mr. Wilson said Ms. Crane used "a confrontational and unprofessional tone" during a call on June 30, 2021. *Id.*; *see* DI 37-2 ¶ 76.[6] Mr. Wilson further stated that Ms. Crane sent a FEMA director an email with "inappropriate and unprofessional comments," including an assertion that "employees who

---

[6] Ms. Densford testified that Ms. Crane behaved unprofessionally during the meeting, but Ms. Pence could not recall a meeting where Ms. Crane "used a confrontational or unprofessional tone." DI 37-2 ¶ 128.

'conduct themselves with the utmost care and decency . . . are the exception to the rule in [FEMA's] IRC [Interagency Coordination Division].'" DI 29-2 Ex. BB; *see* DI 37-2 ¶ 80.[7]

To that point, FEMA had never disciplined Ms. Crane. DI 29-2 Ex. BB. A copy of the reprimand letter was to be placed in her personnel file "for a period not to exceed three (3) years," but Mr. Wilson maintained the discretion to remove it from her file sooner. *Id.* Mr. Wilson informed Ms. Crane that she could file a complaint with the FEMA Office of Equal Rights if she felt the letter "was the result of prohibited discrimination based on . . . sex." *Id.* And the letter meant Ms. Crane was no longer in "good standing," preventing her from later pursuing a position she wanted on FEMA's Reservist Advisory Board. *See* DI 37-2 ¶¶ 87-92.[8]

In September 2021, Ms. Crane applied for a Federal Disaster Recovery Officer (FDRO) II position posted by FEMA. *Id.* ¶¶ 93, 96. To successfully apply, applicants had to submit — among other materials — "three recent performance evaluations." *Id.* ¶ 94. Ms. Crane submitted an incomplete application with only one performance appraisal. *See id.* ¶¶ 97-98. FEMA did not hire her. *See id.* ¶ 103. And FEMA did not hire anyone to fill the FDRO II position because, like Ms. Crane, none of the applicants submitted three performance evaluations. *See id.* ¶¶ 100-02.

Construing her work environment as retaliatory and hostile, Ms. Crane contacted the

---

[7] Other employees complained about Ms. Crane's workplace conduct outside of the two incidents cited in the reprimand letter. *See* DI 37-2 ¶¶ 71-74, 77.

[8] Ms. Crane later received two additional notices of misconduct in 2022. The first said that Ms. Crane's workplace "tone ha[d] been construed at times as both aggressive and bullying." DI 29-2 Ex. SS. The second said that Ms. Crane had an "aggressive, condescending, and combative" interaction with another FEMA employee. *See id.* Ex. UU.

Equal Opportunity Employment Commission (EEOC) in August 2021.  *But see id.* ¶ 119; DI 29-2 Ex. KK.[9]  She filed a formal complaint with the EEOC on November 15, 2021.  *See* DI 29-2 Ex. KK.  After the EEOC concluded that FEMA did not discriminate against her, Ms. Crane sued here.  *See* DI 37-2 ¶¶ 121, 123.  Ms. Crane alleged that FEMA subjected her to a hostile work environment based on her sex and retaliated against her because she reported sexual harassment by Mr. Rowland.  *See generally* DI 3.

**II.**     **The Government's Motion for Summary Judgment**

The government argues that Ms. Crane's Title VII claims[10] fail for multiple reasons.  *See generally* DI 22.  It says Ms. Crane "did not contact an EEO counselor within 45 days of any allegedly sexually harassing activity" — thus dooming her hostile work environment claim.  *Id.* at 8.  And even if Ms. Crane overcame that problem, the government argues that Ms. Crane is missing three of the five elements needed to prove a hostile work environment claim.  *See id.* at 10.

Further, the government contests Ms. Crane's retaliation claim in just about every way.

---

[9] Ms. Crane's formal EEOC complaint lists September 27, 2021 as the "date [she] contacted an EEO counselor."  DI 29-2 Ex. KK.  But the parties generally agreed at oral argument that Ms. Crane's first contact with the EEOC was in August 2021.  We will use the month the parties agree on — August 2021 — as the operative date, which affects our analysis of the allegedly retaliatory actions.

[10] Ms. Crane also brings two parallel employment claims under Pennsylvania law.  *See* DI 3 at 8-10.  The government argues that Ms. Crane cannot assert state law claims because Title VII "is the exclusive remedy for federal employees alleging discriminatory employment practices."  DI 22 at 45.  Ms. Crane asks that we "construe the arguments" she makes for her Title VII claims the same as her state law claims.  DI 37-1 at 4 n.1.  Because Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment," Ms. Crane's state claims may not proceed.  *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976).

It reiterates its argument regarding timely administrative exhaustion. *Id.* at 24. It argues that Ms. Crane's initial email in October 2020 complaining about Mr. Rowland's painting is not a Title VII protected activity. *See id.* at 20-23. It argues that four of the five allegedly retaliatory activities taken against Ms. Crane are not materially adverse. *See id.* at 26-30. It says there is no causal connection between any materially adverse action and protected activity. *See id.* at 30-35. And it finishes that Ms. Crane cannot "rebut FEMA's proffered explanation of events" that she perceived as retaliatory, "nor prove that these explanations are pretextual" under Title VII's *McDonnell Douglas*[11] burden-shifting framework. *Id.* at 37.

Ms. Crane did not respond to the government's arguments regarding administrative exhaustion. *See* DI 37-1. But she argues that she "found [Mr. Rowland's] painting subjectively hostile and inappropriate," and that is enough to survive summary judgment for her hostile work environment claim. *Id.* at 5. For her retaliation claim, Ms. Crane argues that a jury can find her October 2020 email about Mr. Rowland's painting is a Title VII protected activity because she complained about sex-related content. *See id.* at 9. She insists that she suffered several materially adverse actions with a causal connection to her complaints about Mr. Rowland and his painting. And in Ms. Crane's view, credibility issues preclude any grant of summary judgment. *See id.* at 16-18. In particular, Ms. Crane challenges the credibility of Ms. Densford's deposition testimony. *Id.* at 18.

We have subject-matter jurisdiction over Ms. Crane's causes of action. *See* 28 U.S.C. §§ 1331, 1367. We also heard oral argument on the government's motion. *See* DI 45. The

---

[11] *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

motion is ripe for disposition and, for the reasons set forth below, is granted.

**III.**     <u>**Standard of Review**</u>

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 144 (3d Cir. 2023) (quoting Fed. R. Civ. P. 56(a)). "A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). We must "constru[e] all evidence in the light most favorable to the nonmoving party." *Sec'y U.S. Dep't of Lab. v. Kwasny*, 853 F.3d 87, 90 (3d Cir. 2017). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

**IV.**     <u>**Analysis**</u>

We begin with the argument Ms. Crane did not address in her response — that she failed to timely exhaust her administrative remedies with the EEOC by contacting the agency within 45 days of the allegedly discriminatory activities. The government makes the exhaustion argument for both of Ms. Crane's Title VII claims. *See* DI 22 at 7-9, 24.

"It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief." *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997). To properly exhaust administrative remedies as a federal employee, the employee "must: (1) contact the agency's EEO counselor *within 45 days of the alleged discriminatory action*; (2) file a formal complaint with the EEOC within 15 days of the

conclusion of the informal counseling process, if unsuccessful; and (3) appeal the agency's final decision to the EEOC or file a civil action in federal district court within [90] days of the agency's decision." *Broadnax v. Sec'y U.S. Dep't of Veterans Affs.*, 860 F. App'x 800, 803 (3d Cir. 2021) (emphasis added) (citing 29 C.F.R. §§ 1614.105-1614.109, 1614.401, 1614.407(a)); *see Harris v. Postmaster Gen. of U.S.*, 2022 WL 336999, at *1 (3d Cir. Feb. 4, 2022). "[A] plaintiff's failure to timely exhaust administrative remedies bars [her] subsequent claim in federal court." *Harris*, 2022 WL 336999, at *1.[12]

Ms. Crane's formal EEOC complaint says that she first contacted an EEO counselor on September 27, 2021. DI 29 Ex. KK. But the parties agreed at oral argument that Ms. Crane first contacted the EEOC sometime in August 2021. Either month is well past 45 days after Ms. Crane (1) first complained to Ms. Densford about Mr. Rowland's painting in October 2020, *see* DI 37-2 ¶ 28, (2) last saw Mr. Rowland's painting, and (3) complained a second time about Mr.

---

[12] Exceptions exist for "continuing" Title VII violations — where "the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165-66 (3d Cir. 2013). Further, "[t]he forty-five-day period for initiating EEO contact may be equitably tolled if the employee: (1) 'was not notified of the time limits and was not otherwise aware of them,' (2) 'did not know and reasonably should not have . . . known that the discriminatory matter or personnel action occurred,' (3) 'despite due diligence . . . was prevented by circumstances beyond h[er] . . . control from contacting the counselor within the time limits,' or (4) shows 'other reasons considered sufficient by the agency or the Commission.'" *Harris*, 2022 WL 336999, at *3 (quoting 29 C.F.R. § 16914.105(a)(2)).

Ms. Crane did not argue in her opposition that any exception to the EEOC's general rule applies in her case. But she referenced an exception to the exhaustion issue at oral argument. She argued that FEMA could have acted on her complaint about Mr. Rowland's painting sooner, instead of leading her on and "mull[ing] over the best approach" to resolve the issue. *See* DI 37-2 ¶ 33. Even if Ms. Crane had meaningfully argued this notion, on this record, it would not equitably toll the 45-day period.

11

Rowland and his painting in January 2021, *see id.* ¶¶ 56-57. Because Ms. Crane bases her hostile work environment claim on Mr. Rowland's allegedly discriminatory activity in displaying his painting, she did not timely exhaust her claim.[13]

The same principle applies for Ms. Crane's retaliation claim.[14] The government refers to

---

[13] Even if we disregard exhaustion issues, we agree with the government that (i) Mr. Rowland did not intentionally discriminate against Ms. Crane because of her sex by displaying his painting for a few weeks and later removing it, and (ii) the conduct at issue is neither severe nor pervasive. *See Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quoting *Mandel*, 706 F.3d at 167) ("To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate that," among other things, "[t]he employee suffered intentional discrimination because of his/her sex, (2) the discrimination was severe or pervasive.").

Ms. Crane backs into her hostile work environment claim, arguing that "[t]here is no question that [she] found the painting *subjectively* hostile and inappropriate." DI 37-1 at 5 (emphasis added). Importantly, the Supreme Court has said that subjectivity is only half of the equation needed to demonstrate a hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("[I]n order to be actionable under [Title VII], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive . . . .").

The only fact that Ms. Crane cites to show she suffered intentional discrimination based on her sex is that her coworker, Ms. Pence, "belie[ved] that [Mr. Rowland's] painting was also inappropriate." DI 37-1 at 5; *see* DI 28-1 Ex. L; *see also Nitkin*, 67 F.4th at 570 (quoting *Faragher*, 524 U.S. at 788) ("The Supreme Court has emphasized that 'conduct must be extreme' to satisfy" the severe or pervasive requirement, "so 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are inadequate."). But Mr. Rowland never made sexually explicit comments to Ms. Crane, never threatened her, and removed his painting shortly after he heard that someone found it inappropriate for the workplace. There is a substantial and legally meaningful gap between something that might be considered inappropriate for the workplace and a hostile work environment. The facts viewed in the light most favorable to Ms. Crane show neither intentional discrimination nor conduct that is severe or pervasive.

[14] "Under the *McDonnell Douglas* framework, a plaintiff asserting a retaliation claim first must establish a prima facie case by showing '(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (alteration in original) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

five allegedly retaliatory actions that can support Ms. Crane's retaliation claim, but in her opposition, Ms. Crane focuses on only two: (1) her request to transfer to the Hawaii project in October 2020, DI 37-1 at 13, and (2) the July 20, 2021 reprimand letter she received, *id.* at 14. *See also* DI 42 at 5. Because her October 2020 request falls well outside the 45-day window within which she must have contacted the EEOC, Ms. Crane did not timely exhaust her claim with respect to that allegedly adverse action. So we may set that aside. In contrast, at oral argument, the government and Ms. Crane generally agreed that Ms. Crane's July 20, 2021 reprimand letter fell within the 45-day time frame. And we further note that the rejection of Ms. Crane's application for the FDRO II position in September 2021 was also within the 45-day window. *See* DI 22 at 25 n.10. Thus, we will focus on two allegedly adverse actions: the July 20, 2021 reprimand letter and the denial of Ms. Crane's FDRO II application in September 2021.

The government argues that neither action is sufficiently "adverse" to support a retaliation claim. *See id.* at 28-30.[15] The government further submits that there is no causal

---

And "[i]f the employer advances" a "legitimate, non-retaliatory reason for having taken the adverse action . . . the burden shifts back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)).

[15] Despite the reprimand letter being placed in Ms. Crane's personnel file, the government argues it is not an adverse action because the letter did "material[ly] change . . . the terms and conditions of [Ms. Crane's] employment." DI 22 at 29. The government's argument recites the incorrect standard for adverse employment actions necessary to prove a *retaliation* claim, versus adverse employment actions supportive of a Title VII *discrimination* claim. *See Friel v. Mnuchin*, 474 F. Supp. 3d 673, 686 n.56 (E.D. Pa. 2020) ("For retaliation purposes, an adverse employment action is one that would dissuade a reasonable employee from making or supporting a charge of discrimination. An action that would dissuade a reasonable employee from engaging in protected activity *may not be serious or tangible enough to materially alter the*

connection between the actions and Ms. Crane's complaints about Mr. Rowland's painting. *See id.* at 30-32. And the government insists that Ms. Crane cannot prove its legitimate, non-retaliatory reasons for either action were false. For the reprimand letter, the government says that Ms. Crane's "hostile, combative, and unprofessional tone" with other FEMA employees necessitated the letter. *See id.* at 38. And the government states that Ms. Crane's failure to submit three performance evaluations with her FDRO II application caused it to be denied. *See id.* at 40-41.

Assuming, *arguendo*, that Ms. Crane can prove a prima facie retaliation claim based on either allegedly adverse action, she does not meet her burden to demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the government's legitimate non-retaliatory reasons for the adverse actions. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). To meet her burden under *McDonnell Douglas*, Ms. Crane relies on purported contradictions between her testimony and the testimony of Ms. Pence and Ms. Densford, which she argues "question the veracity" of the government's non-retaliatory reasons. DI 37-1 at 18. We disagree. The only contradiction pertaining to either adverse action is Ms. Pence's and Ms. Densford's difference in opinion regarding Ms. Crane's professionalism "during an all-hands Teams call" that Mr. Wilson referenced in his reprimand letter. *Id.*; *see* DI 29-2 Ex. BB. And

---

*conditions of employment*." (emphasis added)). Strangely, the government recognizes the difference, *see* DI 22 at 23 n.9, but argues anyway that the letter did "not effect a material change in [Ms.] Crane's terms of employment," *id.* at 29 (citing *Deans v. Kennedy House, Inc.*, 587 F. App'x 731, 734 (3d Cir. 2014)).

Regardless, we can assume — without conclusively deciding — that the reprimand letter is an adverse action because Ms. Crane still lacks evidence calling into question the government's legitimate, non-retaliatory reason for issuing it.

14

Ms. Crane's conduct during the Teams call is merely one of several instances of misconduct cited in Mr. Wilson's letter. A single, rather tangential, difference in perception between Ms. Pence and Ms. Densford is not enough evidence to "allow a jury to reasonably '(1) disbelieve [the government's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of'" Mr. Wilson issuing the reprimand letter. *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 349 (3d Cir. 2022) (quoting *Fuentes*, 32 F.3d at 764).

Therefore, we grant the government summary judgment on Ms. Crane's retaliation cause of action.

V.     **Conclusion**

Large portions of Ms. Crane's claims are barred because she did not timely exhaust them with the EEOC as a federal employee. To the extent that her retaliation claim is predicated on the reprimand letter she received in July 2021, or being denied the FDRO II position in September 2021, Ms. Crane has insufficient evidence rebutting the government's legitimate, non-retaliatory reason for both actions. Therefore, we grant the government summary judgment on Ms. Crane's Title VII claims.